IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FRIENDS OF THE COLUMBIA GORGE, INC.,
an Oregon non-profit corporation,

        Plaintiff,

    v.

UNITED STATES FOREST SERVICE, an agency
of the United States Department of Agriculture,

        Defendant.

CV-04-1332-ST

FINDINGS AND
RECOMMENDATIONS

STEWART, Magistrate Judge:

## INTRODUCTION

In 2004, Sirrah Corporation and the Harris Family Trust (collectively "Sirrah"), sought a temporary use permit from defendant, United States USFS ("USFS"), to reopen a road on federal land in Skamania County, Washington, within the Columbia River Gorge National Scenic Area ("National Scenic Area") for access to private land for logging. The USFS is a federal agency responsible for managing federal lands within the National Scenic Area. After the USFS granted the permit to Sirrah, plaintiff, Friends of the Columbia Gorge ("Friends"), filed this suit, alleging

1 - FINDINGS AND RECOMMENDATIONS

that the USFS issued the permit without sufficient analysis under the National Environmental

Policy Act ("NEPA"), 42 USC §§ 4321–4347, and the Columbia River Gorge National Scenic

Area Act ("Scenic Area Act"), 16 USC §§ 544–544p.  Friends is a non-profit organization with

members in more than 3,000 households dedicated to protecting and enhancing the resources of

the Columbia River Gorge.

After the parties agreed to a temporary stay, the USFS issued a quitclaim deed to Sirrah

on November 29, 2005, providing a permanent easement for use of the road for ingress and

egress.  Friends now seeks a declaration that the issuance of the deed violated NEPA and the

Scenic Area Act and also seeks to enjoin any further road work and use until the USFS complies

with the law.

This court has jurisdiction under 28 USC §§ 1331 and 1346 because this action involves

the United States as a defendant and arises under the laws of the United States, including the

Administrative Procedure Act ("APA"), 5 USC §§ 551–559, 701–706 *et seq.*, NEPA, and the

Scenic Area Act.

The parties have filed cross-motions for summary judgment (dockets # 44 and # 56).  For

the reasons set forth below, Friends' motion should be granted and the USFS's motion should be

denied.

## STATUTES

## I.    NEPA

NEPA "declares a broad national commitment to protecting and promoting

environmental quality."  *Robertson v. Methow Valley Citizens Council*, 490 US 332, 348 (1989);

*see also* 42 USC § 4331.  It is a procedural statute that does not "mandate particular results, but

simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *High Sierra Hikers Ass'n. v. Blackwell,* 390 F3d 630, 639 (9th Cir 2004) (citation omitted). NEPA's disclosure goals are to ensure: (1) that the agency has carefully and fully contemplated the environmental effects of its action, and (2) that the public has sufficient information to challenge the agency. *Robertson*, 490 US at 349; *Idaho Sporting Cong. v. Thomas*, 137 F3d 1146, 1151 (9th Cir 1998). By focusing the agency's attention on the environmental consequences of its proposed action, NEPA "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 490 US at 349. Thus, NEPA requires federal agencies to analyze and disclose the direct, indirect and cumulative impacts of their actions. 40 CFR §§ 1502.16(a), 1502.16(b), 1508.7.

To that end, NEPA mandates that, to the fullest extent possible, all federal agencies must prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 USC § 4332(2)(C). As a preliminary step, the agency may prepare an Environmental Assessment ("EA") to determine whether the environmental impact of the proposed action is significant enough to warrant an EIS. *Nat'l Parks & Conservation Ass'n v. Babbitt,* 241 F3d 722, 730 (9th Cir 2001); *see* 40 CFR § 1508.9. An EA must be prepared unless the agency decides to go ahead and prepare an EIS, *see* 40 CFR § 1501.3(a), or unless the action comes within a Categorical Exclusion. *See* 40 CFR § 1508.3.

If, after preparing an EA, an agency determines based on the factors specified in 40 CFR § 1508.27(b) that "substantial questions are raised as to whether the project may cause significant degradation of some human environmental factor," the agency is required to prepare

an EIS.  *West v. Sec'y of Dept. of Transp.,* 206 F3d 920, 927 (9th Cir 2000) (citation omitted).

"Because the very important decision whether to prepare an EIS is based solely on the EA, the

EA is fundamental to the decision-making process."  *Metcalf v. Daley*, 214 F3d 1135, 1143 (9th

Cir 2000); *see also* 40 CFR § 1500.1(b); *Idaho Sporting Cong.*, 137 F3d at 1151.

    If the agency determines on the basis of the EA not to prepare an EIS, then it must

prepare a Finding of No Significant Impact ("FONSI") to set forth a "convincing statement of

reasons" to explain why the action will not have a significant impact on the environment.  *Blue

Mountains Biodiversity Project v. Blackwood*, 161 F3d 1208, 1212 (9th Cir 1998); *see also* 40

CFR §§ 1501.4(e), 1508.13.  "The statement of reasons is crucial to determining whether the

agency took a 'hard look' at the potential environmental impact of a project."  *Blue Mountains

Biodiversity Project*, 161 F3d at 1212 (citation omitted).

    NEPA regulations also recognize that certain types of actions will have no significant

environmental impact.  Agencies are directed to identify and designate as Categorical Exclusions

those categories of actions "which do not individually or cumulatively have a significant

effect on the human environment and which have been found to have no such effect in

procedures adopted by a Federal agency."  40 CFR § 1508.4.  If an action falls into such a

category, the USFS may categorically exclude that action from further NEPA analysis unless the

action may have adverse effects or there are extraordinary circumstances.  *USFS Handbook*,

1909.15, § 30.3(2).

///

///

**II.    Scenic Area Act**

4 - FINDINGS AND RECOMMENDATIONS

The Scenic Area Act was enacted in 1986:  (1) "to establish a national scenic area to protect and provide for the enhancement of the scenic, cultural, recreational, and natural resources of the Columbia River Gorge;" and (2) "to protect and support the economy of the Columbia River Gorge area by encouraging growth to occur in existing urban areas and by allowing future economic development in a manner consistent" with the first purpose.  16 USC § 544a.  To further these purposes, the Scenic Area Act divided National Scenic Area land into three categories: Special Management Areas ("SMAs"), Urban Areas, and the General Management Area ("GMA").  *Id* at § 544b(b), (e).  The SMAs contain the most sensitive resources and, therefore, receive the greatest protection.  Plaintiff's Exhibit D, p. 3.  The Scenic Area Act also requires the preparation of a management plan to govern land uses and development within the National Scenic Area, including uses on federal lands.  16 USC § 544d(c)(4), (d).

Pursuant to this mandate, the Columbia River Gorge Commission adopted the Management Plan for the Columbia River Gorge National Scenic Area in 1991 ("Management Plan").  Plaintiff's Exhibit D, p. 2.  The following year, the Secretary of Agriculture concurred with the Gorge Commission's determination that the Management Plan was consistent with the Scenic Area Act.  *Id*.  In 2004, the Gorge Commission adopted a Revised Management Plan ("RMP").  Administrative Record ("AR") 53–367.  In August 2004, the Secretary of Agriculture issued her concurrence that the RMP was consistent with the Scenic Area Act.  Plaintiff's Exhibit E (Letter from Linda Goodman to Anne Squire).

The USFS shall "administer Federal lands within the [SMAs] in accordance with [the Scenic Area Act] and other laws, rules, and regulations applicable to the National Forest

System." 16 USC § 544f(a).  The USFS must review all uses of federal lands in the National

Scenic Area "and issue a determination of consistency with the Management Plan for projects on

federal lands."  AR 318.

## FACTS

I.    **Subject Road**

The subject road, USFS Road #1852147, is 0.5 miles in length and located within the

National Scenic Area.  AR 79, 104, 394.  The subject road was constructed on a former railroad

bed which was authorized by a 15 year lease in 1908 and has been in place since in 1910.

AR 436.  In 1968, Sirrah acquired land which contained the former railroad bed.  AR 488-89.

Sirrah deeded part of its holdings containing the subject road to Bevard in 1977 and to Ursin in

1978.  AR 490-92.  In both sales, Sirrah reserved for itself a non-exclusive easement as grantor

for ingress and egress, 60' in width, over the existing railroad bed.  *Id*.  The USFS acquired the

Ursin parcel in 1990.  AR 425.  The USFS also acquired an adjacent 235 acre parcel from

Becker in 1991.  AR 483-84.  Title to the Ursin parcel (not at issue in this litigation) was subject

to the reserved easement by Sirrah.  *Id*.  The dispute centers around a small portion of the subject

road which encroaches onto the neighboring Becker parcel acquired by the USFS and to which

Sirrah has no recorded easement.

In March 2003, a Columbia River Gorge National Scenic Area Roads Analysis Report

("Roads Analysis") was created, along with maps and recommendations as updated.

Supplemental Administrative Record ("Suppl. AR") 06-124.  It was based on a road inventory

that was required to include all classified and unclassified roads on National Forest lands.  USFS

Road # 1852147 was shown on the map as "private ownership related and administrative access

6 - FINDINGS AND RECOMMENDATIONS

only."  Suppl. AR 104.  The USFS designated both the objective (desired future status) and

operational (current status) maintenance levels for the subject road as "Level 1."  AR 406; *see*

*also* Suppl. AR 77 (defining abbreviations and categories for table contained at AR 406).

Level 1 roads are defined as roads that are closed for more than one year and not open to

vehicular traffic.  Suppl. AR 73.  The Roads Analysis also concluded that USFS Road #1852147

poses a high risk to aquatic and wildlife resources.  Suppl. AR 91.  Finally, the Roads Analysis

noted that the road had completely closed naturally from being "brushed in" and was a "high"

priority for permanent closure.  Suppl. AR 79.

## II.      **Temporary Use Permit**

Sirrah owns approximately 180 acres of forest land adjacent to National Forest land, the

majority of which is accessible via USFS Road #1852417 and two other alternative, but less

desirable, access routes.  Declaration of Nathan Baker ("Baker Decl."), ¶ 8; AR 421-22.  On

May 28, 2004, Sirrah submitted an application to the USFS for a temporary road use permit in

order to "haul approximately 40 loads of logs" and accommodate "associated large equipment

such as tractors and log loaders" on USFS Road #1852147 during the 2004 or 2005 logging

season.  AR 370, 372.  In order to facilitate logging traffic, Sirrah proposed "brushing of

salmonberry to an 8'–10' width and intermittent cutting of pole sized (2"–6" diameter) alder to

provide a clearance width (13') for a log loader."  AR 372.  Sirrah also proposed to lop and

scatter all slash along the roadway and install "2–3 drivable cross drains . . . to divert water off

the road during periods of heavy rain or snowmelt."  *Id*.  Sirrah also planned to "blade" the road

after log haul to fill in "any significant depressions [that] developed."  *Id*.

7 - FINDINGS AND RECOMMENDATIONS

On June 14, 2004, the USFS sent a letter to interested parties seeking comments on the proposed road use permit.  AR 376-85.  Friends submitted comments on the proposal on July 14, 2004.  AR 386–93.

On July 20, 2004, Daniel Harkenrider ("Harkenrider"), the USFS Scenic Area Manager, issued a Decision Memo and Consistency Determination granting a temporary road use permit authorizing Sirrah to reconstruct and use USFS Road #1852147 for logging purposes. AR 394–401.  Harkenrider determined that the permit qualified for a Categorical Exclusion ("CE")[1] under NEPA, citing Category 4 for "repair and maintenance of roads, trails and landline boundaries" and Category 8 for "approval, modification or continuation of minor, short-term (one year or less) special uses of National Forest System lands," and that no extraordinary circumstances precluded application of a CE.  AR 394–95.

The USFS also reviewed the application for consistency with the Management Plan which is required "for projects on federal lands."  AR 395.  A "forest practice" is a "review use" which triggers a Consistency Review.  Although the actual harvest was to occur on Sirrah's private land, the Management Plan (II-38), defines "forest practice" to include road construction and reconstruction.  The Findings of Fact accompanying Harkenrider's Decision Memo concluded that the proposed road work "may be considered [road] reconstruction" because of the significant amount of work needed to make the road usable for the intended purpose.  AR 397. Road reconstruction is designated a "review use," requiring a Consistency Review to ensure compliance with "scenic, cultural, natural and recreational resource guidelines."  *Id*.  Because the

---

[1] The CEs developed by the USFS can be found in the USFS Handbook, 1909.15, §§ 31.13(1)-(10), 31.2 (1)-(14) (available at http://www.fs.fed.us/im/directives/fsh/1909.15/1909.15_30.doc).

actual timber harvest on Sirrah's property was not to occur on federal land or in the National

Scenic Area, it was excluded from the Consistency Review. *Id.* Of approximately 30 guidelines,

the Findings of Fact concluded that many were inapplicable "to road maintenance." *See, e.g.*,

AR 399-400.

Pursuant to the USFS's Consistency Review process (Suppl. AR 1), on August 6, 2004,

Friends requested Linda Goodman ("Goodman"), the Regional Forester, to review Harkenrider's

decision to issue the temporary road use permit, reverse the decision, and direct the USFS to

conduct additional analysis under NEPA and the Scenic Area Act. AR 402-04. In particular,

Friends noted that "the Area Manager failed to determine whether the road qualifies as a legally

existing use under the Management Plan." AR 402.

By August 13, 2004, the USFS had begun to examine the history of the subject road and

adjacent land ownership. AR 407.

Friends filed this lawsuit on September 14, 2004.

By November 18, 2004, the USFS reached a preliminary conclusion that Sirrah may have

unperfected rights to a portion of the subject road, such that its designation as a USFS road may

have been in error. AR 424-26. On December 7, 2004, the USFS sent a letter to the president of

Sirrah, informing him that Sirrah potentially had prescriptive rights to the Becker parcel,

acknowledging Sirrah's reserved easement for ingress and egress on the Ursin parcel, and

requesting documentation in support of a claim of prescription on the Becker parcel. AR 427-28.

On January 19, 2005, Goodman upheld Harkenrider's decision, concluding that the road

in question was a "current, existing use consistent with the Management Plan (September 1992

version)" because under "USFS policy, the road is at present a USFS system road [and] under

the Management Plan its intended use is intermittent," consistent with Sirrah's proposed use.

AR 437.  Goodman declined to make a determination regarding Friends' NEPA claims because a

USFS regulation in effect at the time precluded administrative appeals of agency decisions about

Categorical Exclusions from NEPA review.  AR 435.

**III.     Quitclaim Deed Granting Easement**

On February 15, 2005, Sirrah's attorney contacted the USFS asserting a prescriptive

easement across USFS Road #1852147.  AR 442–44.   In response, the USFS asked Sirrah to

provide further documentation, including an abstract of title, witness statements or recorded

documents addressing the "history and use of the road," a description of Sirrah's use of the road,

history and plats of boundary surveys, maps, and photographs.  AR 469.  The USFS noted that

the "thoroughness" of the documentation would be "critical to [its] ability to reach an

administrative decision."  *Id*.  Because Sirrah failed to respond, the USFS sent another request

for documentation on May 3, 2005.  AR 469.

On May 19, 2005, the parties agreed to stay this case while the USFS reevaluated its

decision to grant the temporary road use permit (docket # 8).  On June 7, 2005, a Title Claim and

Encroachment Report was finalized for the subject road and forwarded to the Regional Office.

AR 471-521.  The report concluded that the USFS erred during its acquisition of the Becker

parcel by failing to discover encroachment of approximately 700 feet of the subject road which

provides the only legal access to Sirrah lands lying south of Canyon Creek.  AR 477.  Due to the

history of use, the report concluded that Sirrah had accrued unperfected rights to the road that

pre-dated federal acquisition of the underlying parcel from Becker and recommended that the

USFS issue a quitclaim deed to Sirrah.  AR 478.

Without any analysis under NEPA or input from the public, the USFS issued a quitclaim deed to Sirrah on November 29, 2005, conveying a permanent "easement for ingress and egress, 20 feet in width, 10 feet each side of the centerline of an existing railroad grade" lying along the subject road on the Becker parcel. AR 523. Because the USFS determined that Sirrah "already ha[d] a legal right to use the road as reflected in the quitclaim deed," on December 6, 2005, it withdrew the NEPA portion of the July 20, 2004 Decision Memo and implicitly withdrew the temporary use permit, explaining that "as issuance of a temporary use permit is not necessary, there is no federal action requiring compliance with NEPA." AR 527. It specified, however, that the July 20, 2004 Consistency Determination with certain mandatory conditions was to remain in effect because the forest practice, not the permit, was the "review use." *Id*.

Friends later filed an Amended Complaint to challenge the issuance of the quitclaim deed (docket # 23). On January 31, 2007, the staff attorney for Friends visited USFS Road #1852147 and noted that road work, including clearing and widening, had occurred. Baker Decl., ¶ 7.

## FINDINGS

### I.    Violation of NEPA

Friends contends that the USFS violated NEPA by failing to conduct a NEPA analysis when it: (1) issued the quitclaim deed granting an easement for ingress and egress to Sirrah over the Becker parcel which altered the *status quo*; and (2) conducted the Consistency Review. As a threshold issue, the USFS responds that this court lacks jurisdiction to evaluate the propriety of granting the quitclaim deed because it was ministerial act involving no discretion. The USFS also denies that the quitclaim deed altered the *status quo* or that the Consistency Review triggers NEPA.

11 - FINDINGS AND RECOMMENDATIONS

A.    **Granting of the Easement**

1.    **Discretionary Act**

This court has jurisdiction to review the issuance of the quitclaim deed which granted an easement to Sirrah only if that act triggers the application of NEPA.  Non-discretionary actions do not trigger NEPA.  *See Dept. of Transp. v. Public Citizen*, 541 US 752, 769 (2004) (NEPA provides that an agency need not prepare an EIS for an action that is effectively beyond its discretionary control); *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F3d 1144, 1151 (DC Cir 2001) (where an agency's role is "merely ministerial, the information that NEPA provides can have no effect on the agency's actions, and therefore NEPA is inapplicable").  As its first line of defense, the USFS argues that issuance of the quitclaim deed did not violate NEPA because it was a ministerial, not a discretionary, act.

At the time the USFS was considering Sirrah's temporary road use permit application, it believed that USFS Road #1852147 was under its full jurisdiction.  AR 370.  Once the USFS concluded that Sirrah had valid rights to ingress and egress over the subject road that pre-dated federal acquisition of the underlying land from Becker, it withdrew the temporary use permit decision on the basis that it had no discretion over Sirrah's use of the road.  AR 527.  Under its own guidance documents, the USFS is directed not to exercise jurisdiction over "[r]oads on which rights-of-way were reserved or were outstanding on acquired lands before title passed to the United States."  USFS Manual at § 7703.3(3)(b).  The USFS claims that because it lacked discretion to prevent Sirrah from using the road, it acted in a ministerial capacity to recognize Sirrah's pre-existing rights.

As the basis for its lack of discretion, the USFS points to the following statute:

> If the Secretary of Agriculture shall find after the acquisition by the
> United States of any land or interest therein which is subject to his
> administration, custody, or control . . . that title or color of title to such
> land or interest was acquired through mistake, misunderstanding, error, or
> inadverterce, he is hereby *authorized* to execute and deliver on behalf of
> and in the name of the United States to the person . . . whom he finds
> entitled thereto a quitclaim deed to such land or interest . . . .

7 USC § 2253 (emphasis added).

Pursuant to this statute, the Secretary is "authorized" to issue a "quitclaim deed" in order

to correct title "acquired through mistake, misunderstanding, error, or inadvertence."  The

language used is permissive and does not mandate the Secretary to take such action.  Instead it

merely reserves the Secretary's discretion to do so.  If the Secretary does not exercise his or her

discretionary authority to issue a quitclaim deed, then the purported interest holder may assert an

interest in land in district court within 12 years of the accrual of the action.  28 USC § 2409a(a),

(g).  Thus, even if Sirrah had a pre-existing right to an easement when the USFS acquired the

Becker parcel, the USFS was not compelled by 7 USC § 2253 to correct the title by issuing a

quitclaim deed.

Had Sirrah filed a quiet title suit against Becker or the USFS to obtain an easement and

won, then issuing the quitclaim deed would have been mandated by court order and would not

have been a discretionary act.  However, up to that point, the USFS conceivably could refuse to

grant any easement to Sirrah.  Even if Sirrah had the right to an easement arising from the

construction of the original railroad in 1910, he may have lost that right through the passage of

time, allowing the USFS to plead a statute of limitations defense.  For example, if Sirrah knew or

should have known of the encroachment in 1991 when the USFS purchased the Becker property,

then any quiet title action by Sirrah against the USFS to enforce its alleged right to use the

disputed segment of the road would have been barred by the statute of limitations in 2005 when

Sirrah first asserted a prescriptive easement.  Of course, the USFS could waive such a defense,

but only by exercising its discretion to do so.  Generally, the determination as to whether an error

exists that needs to be remedied is a question both of fact and law upon which reasonable

persons can differ.  Even if the USFS correctly interpreted the facts and the law that Sirrah was

entitled to a pre-existing easement and acted appropriately by seeking to avoid expensive

litigation, it still retained discretion whether to act absent some mandate imposed upon it.

The USFS also argues that it does not "satisfy NEPA's 'rule of reason' to require an

agency to prepare a full EIS due to the environmental impact of an action it could not refuse to

perform."  *Dept. of Transp.*, 541 US at 769.  "[I]nherent in NEPA . . . is a 'rule of reason' which

ensures that agencies determine whether and to what extent to prepare an EIS based on the

usefulness of any new potential information to the decisionmaking process."  *Id* at 767.  In other

words, NEPA's rule of reason "turns on the value of the new information to the still pending

decisionmaking process."  *Marsh v. Oregon Natural Resources Council*, 490 US 360, 374

(1989).  The USFS believes that it would not satisfy NEPA's rule of reason to evaluate the

environmental effects of a decision the USFS was required to make.  Again, however, granting

an easement was a decision that the USFS was authorized, but not required, to make.  Hence, the

rule of reason is inapplicable.

///

2.    __ANILCA__

Alternatively, the USFS argues that it had no obligation to undertake a NEPA analysis

due to the Alaska National Interest Lands Conservation Act ("ANILCA").  ANILCA provides

that the Secretary of Agriculture "*shall* provide such access to nonfederally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure to the owner the reasonable use and enjoyment thereof . . . ." 16 USC § 3210 (a) (emphasis added). ANILCA is not limited to land in Alaska, but has nationwide application.  *Montana Wilderness Ass'n v. U. S. Forest Serv.*, 655 F2d 951, 957 (9th Cir 1981), *cert denied*, 455 US 989 (1982) (holding that inholder had an "assured right of access" to land in Montana).  Accordingly, the USFS argues it was required to provide Sirrah with reasonable access to its lands.

Friends responds that ANILCA only applies to private land completely surrounded by the National Forest System, and not to lands, like those owned by Sirrah, that are adjacent to, but not wholly within, the boundaries of a National Forest.  Sirrah's property is bounded by National Forest land only on the south, and in one location, on the east. AR 49, 423.  Although the Ninth Circuit has not directly addressed this issue, it has described an "inholder" as an owner of "private property completely surrounded by federally owned National Forest System lands." *Adams v. United States*, 255 F3d 787, 790 (9th Cir 2001).  This court concurs with the conclusion reached by *Bunyard v. U. S. Forest Serv*., 301 F Supp2d 1052, 1058, (D Ariz 2004), that "Congress's use of the phrase 'within the boundaries' is a strong indicator that ANILCA is intended to apply only to landlocked properties," and that "ANILCA's legislative history supports [that] common sense interpretation."  Thus, ANILCA does not apply to the Sirrah property because it is not completely surrounded by National Forest System lands. Furthermore, the record reveals that Sirrah has identified two other alternative means of access to its property, in addition to using the subject road.  AR 421-22.

### 3.    Altering *Status Quo*

15 - FINDINGS AND RECOMMENDATIONS

Only an agency action that significantly alters the environmental *status quo* is subject to NEPA. *See, e.g., Pit River Tribe v. U. S. Forest Serv.*, 469 F3d 768, 784 (9th Cir 2006). The USFS argues that correcting the property record by issuing the quitclaim deed did not alter the *status quo* because that act was distinct from any potential environmental effects. However, this argument overlooks the fact that the quitclaim deed enabled Sirrah to reopen and reconstruct the subject road and maintain permanent access across the road for hauling logs. The road had been closed naturally for at least three years at the time the USFS issued the quitclaim deed to Sirrah.[2] The subject road was "undrivable as it is brushed in with salmonberry vines and alder." AR 416. To become drivable, it required "brushing, . . . small tree removal . . . grubbing of stumps, removal of deleterious material on the road surface, disposal of brush and limbs, and grading." AR 417.

In *National Forest Preservation Council v. Butz*, 485 F2d 408, 411-12 (9th Cir 1973), the Ninth Circuit held that a land exchange by the USFS was subject to NEPA. In that case, the USFS exchanged lands within the Gallatin National Forest for lands owned by Burlington Northern adjacent to the national forest and within Yellowstone National Park. Some of the national forest lands acquired by Burlington Northern would be used by another company to develop a resort. The Ninth Circuit held that the land exchange was "analogous to the licensing of or granting of federal funds to a nonfederal entity to enable it to act" and this "enablement" was subject to NEPA. *Id.* But for the land exchange, the planned development could not occur. Similarly, here the USFS has granted an interest in land to a private party to "enable" that party

---

[2] The Roads Analysis completed in March 2003 identified this road as a Level 1 road, which is a designation given where closure has been in place for at least a year. Suppl. AR 73. Almost an additional two years passed between the Roads Analysis and the decision to grant the easement (AR 527), meaning the road had been closed for at least three years—and likely much longer—at the time the USFS issued the quitclaim deed to Sirrah.

"to act" by logging adjacent private property and hauling logs over federal land which will have environmental impacts. *Id.* As in *Butz*, "such federal enablement [is] subject to NEPA." *Id.*

In addition, leases to private entities for development of federal property "which 'do not reserve to the government the absolute right to prevent all surface-disturbing activity'" require compliance with NEPA. *Bob Marshall Alliance v. Hodel*, 852 F2d 1223, 1227 (9th Cir 1988), *quoting Conner v. Burford*, 836 F2d 1521, 1529-32 (9th Cir 1988); *Pit River Tribe*, 469 F3d at 784. When issuing the quitclaim deed to Sirrah, the USFS "did not reserve to the agenc[y] the absolute right to deny development and did not merely preserve the status quo." *Pit River Tribe*, 469 F3d at 784.

By granting unconditional ingress and egress rights to Sirrah, the quitclaim deed altered the *status quo* in much the same way as the temporary road use permit. The level of work required to make the road passable does not change regardless of whether a road use permit or an easement by deed is granted and, in fact, could have an even greater effect on the environmental *status quo*. In contrast to a temporary use, a permanent use will require continued maintenance and use in the future. This is particularly true where the USFS's own Roads Analysis concluded that the road poses a high risk to aquatic and wildlife resources, and where Sirrah has stated its "intention to get more serious about managing [its] forest land." Supp. AR 91; AR 522; *see also* Baker Decl. ¶¶ 8-9.

Nevertheless, the issuance of the quitclaim deed did not alter the *status quo* if Sirrah had a pre-existing right to an easement for ingress and egress. According to the USFS, the deed merely corrected a title error because Sirrah already had an easement over the entire road, including that portion encroaching on the Becker parcel. In that event, the quitclaim deed

merely preserved the *status quo* by granting to Sirrah an easement that it already possessed and did not trigger application of NEPA.  Therefore, it is necessary for this court to evaluate the propriety of the USFS's decision to issue the quitclaim deed to Sirrah.

### a.    Standard of Review

Because NEPA does not contain a private cause of action, the standard of review is found in the APA.  The APA authorizes judicial review when a person has been "adversely affected or aggrieved by agency action."  5 USC § 702.  The APA defines agency action as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 USC § 551(13); *Norton v. Southern Utah Wilderness Alliance*, 542 US 55, 61-62 (2004).  The USFS's decision to grant an easement to Sirrah for the purpose of reopening and reconstructing a road and hauling logs across National Forest system lands is a final agency action subject to this court's review under 5 USC § 706(2) and 16 USC § 544m(b)(4).

The APA imposes a narrow and highly deferential standard of review limited to a determination of whether the agency action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  5 USC § 706(2)(A).  Under this standard, the court may only determine whether the agency based its decision on a consideration of the relevant factors and avoided making a clear error of judgment.  *Marsh*, 490 US at 378.

> An agency's decision may only be called arbitrary and capricious if: the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Southwest Ctr. for Biological Diversity v. U.S. Forest Serv*., 100 F3d 1443, 1448 (9th Cir 1996).

A court is "not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 US 402, 416 (1971).  However, the arbitrary and capricious standard does not shield agency action from a "thorough, probing, in-depth review" of those actions. *Citizens to Preserve Overton Park*, 401 US at 415.  In addition, the agency's decision can be upheld only on the basis of the reasoning found in its decisions; the reviewing court cannot substitute reasons for agency action that are not in the record. *Anaheim Mem'l Hosp. v. Shalala*, 130 F3d 845, 849 (9th Cir 1997).

While substantive NEPA decisions by an agency are reviewed under the arbitrary and capricious standard, the threshold agency decision that certain activities are not subject to NEPA's procedures are reviewed in the Ninth Circuit under the "less deferential" standard of reasonableness because such determinations are primarily legal issues based upon undisputed historical facts. *High Sierra Hikers Ass'n,* 390 F3d at 640 ("Typically, an agency's decision not to prepare an EIS is reviewed under the arbitrary and capricious standard; however, where an agency has decided that a project does not require an EIS without first conducting an EA, we review under the reasonableness standard."); *Northcoast Envtl. Ctr. v. Glickman*, 136 F3d 660, 666-67 (9th Cir 1998).  Under the reasonableness standard, a court should "defer to an agency's decision only if it is 'fully informed and well considered.'" *High Sierra Hikers*, 390 F3d at 640, *quoting Save the Yaak Comm. v. Block*, 840 F2d 714, 717 (9th Cir 1988).

Here the USFS did not prepare an EIS or EA in 2005, contending that NEPA does not apply to the issuance of the quitclaim deed.  Thus, this case presents a threshold question of NEPA applicability, primarily involving legal issues based on undisputed historical facts.  As a result, the less deferential reasonableness standard applies.

**b.**    **Correcting an Error Based on Explicit Easement**

The USFS contends that although Sirrah initially claimed it held a prescriptive easement,
subsequent examination of the chain of title and history of the Becker property demonstrated that
Sirrah held an "explicit easement" based on the chain of title that predates the USFS's
acquisition of the subject property.

The historical record reveals that the railroad bed was intended to be built fully on the
Ursin parcel and the property that Sirrah presently owns.  AR 486 & 472-73.  However, the
railroad bed was incorrectly located during its original construction and passes through the
Becker property for a short distance.[3]  The relevant land conveyances used legal descriptions that
were not surveyed.  Until a 2005 survey revealed the locational error in construction (AR 534),
the USFS contends that it, Sirrah, and previous interest holders in the Ursin and Becker parcels
all believed the railroad bed was located entirely on the Ursin parcel.  As support, it points to
Skamania County's tax-lot map which includes a dashed line depicting the railroad bed as being
located only on the Ursin parcel, although touching the boundary of the Becker property at one
point.  AR 455.

Although the record supports a mistaken assumption as to the location of the subject road
on the Ursin parcel, the record also contains some evidence as to the actual location of the road.
A 1956 Metsgers map shows the road encroaching on the Becker parcel.  AR 473, 487.  In
addition, Sirrah stated in his March 18, 2004 letter to the USFS requesting permission to use the
subject road for logging that "one small portion of the old railroad grade" was not included in its
reservation of easement rights.  AR 46.  Sirrah would not have sought such permission unless it

---

[3] The parties variously state the distance is about 540 feet or 700 feet.

knew that part of the road encroached on the Becker parcel. It is not clear when or how Sirrah first became aware of the encroachment.

It is not clear what the USFS means by Sirrah having an "explicit easement." Sirrah clearly has no express easement recorded in the chain of title to the Becker property. Absent an express easement, easements may be created by various statutes and judicial doctrines, such as an implied easement or easement by prescription. However, this court has found no judicial doctrine pertaining to an "explicit easement." In fact, the Title Claim and Encroachment Report does not conclude that Sirrah is entitled to an "explicit easement" due to a chain of title error. Instead it makes the following finding:

> When the [USFS] acquired the subject parcel in 1991, it neglected to ascertain the existence of the subject road and therefore did not address the possibility of potential third party rights associated with the road. Had the encroachment been properly discovered, it is likely that the [USFS] would have required the landowner (Becker) to issue an easement to Sirrah Corporation prior to federal acquisition in order to perfect the intended right already found acceptable in the Ursin acquisition.

AR 477.

As a result, it offers the following explanation as to why the USFS should issue a quitclaim deed to Sirrah:

> The rights to use of the road reserved by Sirrah Corporation were found to be acceptable in the Ursin acquisition, and would have also been found acceptable in the Becker acquisition had the road been discovered as an encroachment during the processing of the case. Failure to properly locate the boundaries of the Becker parcel resulted in the acquisition of the parcel without recognition of the existence of the road and the potential rights attached to its use.

AR 478.

In other words, if either Becker or Sirrah had made the request in 1991, the USFS would have willingly granted an easement to Sirrah over the subject road encroaching on the Becker parcel. Not until 2004 did Sirrah make that request. It is perfectly reasonable for the USFS to acknowledge that the subject road mistakenly encroaches on the Becker parcel, but the question presented here is whether granting the easement to Sirrah in 1991 or 2005 is required by law. The fact that everyone now knows that the subject road encroaches on the Becker parcel does not by itself entitle Sirrah to an easement over it for ingress and egress. Instead, Sirrah must establish its right to an easement through some viable legal theory. The chain of title reflects no such right, only an error in the intended location of the railroad bed.

The USFS also claims that it had inquiry notice of Sirrah's easement. In general, a *bona fide* purchaser who acquires property without actual or constructive notice of an easement takes title without the encumbrance of the easement. *Wilhelm v. Beyersdorf*, 100 Wash App 836, 45-46, 999 P2d 54, 60 (2000). A purchaser has inquiry notice, however, when the purchaser is aware of facts that would be sufficient to "put an ordinarily prudent [person] upon inquiry" and, if the purchaser performed an inquiry into those facts, it would lead to discovery of a title defect or third-party interests in the property. *Kirk v. Tomulty*, 66 Wash App 231, 239-40, 831 P2d 792, 797 (1992) (internal quotations and citations omitted). The issue is what easement Sirrah possessed that put the USFS on inquiry notice.

### c.    Prescriptive Easement

The USFS could reasonably conclude that it had inquiry notice that Sirrah may claim an easement right over the Becker parcel due to its 1990 acquisition of the Ursin parcel which contained a reserved easement in Sirrah. AR 453-54. The reserved easement over the Ursin

parcel is for a portion of USFS Road #1852147 which continues onto the Becker parcel and then

onto Sirrah's property.  AR 534.  The reserved easement on the Ursin parcel alone would be

useless to Sirrah for access to its property without an easement also over the Becker parcel.

However, notice of that fact is meaningless unless Sirrah actually had a legal claim to an

easement over the Becker parcel in 1991.  Since Sirrah claimed a prescriptive easement in 2004

(*see* AR 426-27), it is reasonable to conclude that he would have also done so in 1991.[4]

Based on "the history of land ownership, road reservations, and railroad/road use

associated with the Sirrah road," a USFS memorandum dated November 18, 2004, concluded

that Sirrah "would likely prevail on a claim of prescriptive rights" predating the USFS

acquisition of the Becker parcel.  AR 426.  Although the later Title Claim and Encroachment

Report dated June 7, 2005, recommended issuing the quitclaim deed due to Sirrah's assertion of

a prescriptive easement, it did not expressly conclude that Sirrah would prevail on his claim.  AR

477–78.  And it is not clear in the briefing on this motion whether the USFS is contending that

Sirrah has a viable claim to a prescriptive easement.  In any event, this court will address

Sirrah's claim to a prescriptive easement.   The issue with respect to resolving that claim in the

context of this case is not whether the USFS correctly concluded that Sirrah would likely prevail

on a claim of a prescriptive easement, but whether such a conclusion was "fully informed and

well considered."  *High Sierra Hikers Ass'n*, 390 F3d at 640, *quoting Save the Yaak Comm.*, 840

F2d at 717.

------------------------------------

[4] Although "prescriptive rights cannot be obtained against the federal government," *U.S. v. Vasarjs*, 908 F2d 443, 447 n3 (9th Cir 1990) (internal quotations omitted), the USFS could acquire property which is already subject to a prescriptive easement.

"'[Q]uestions involving ownership, transfer and title to real estate have traditionally been resolved according to the laws of the state where the realty is located.'" *Amoco Prod. Co. v. United States*, 619 F2d 1383, 1387 (10th Cir 1980), *citing Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 US 363, 378–79 (1977).  Under Washington law, "[t]o establish a prescriptive easement, a claimant must prove 'use of the servient land that is: (1) open and notorious, (2) over a uniform route, (3) continuous and uninterrupted for 10 years, (4) adverse to the owner of the land sought to be subjected; and (5) with the knowledge of such owner at a time when he was able in law to assert and enforce his rights.'"  *Drake v. Smersh*, 122 Wash App 147, 151, 89 P3d 726, 729 (2004), *quoting Kunkel v. Fisher*, 106 Wash App 599, 602, 23 P3d 1128, 1130 (2001); RCW 7.28.010.

It is reasonable to conclude that any use of the subject road was open and notorious, over a uniform route, and adverse to Becker.  Thus, the viability of Sirrah's prescriptive easement centers primarily on whether the record supports the conclusion that Sirrah or any of its predecessors used the subject road over the Becker parcel continuously and uninterrupted for 10 years.  "[O]ccasional trespasses or acts of ownership do not constitute such continuous possession as will ripen into a title by adverse possession, [even when] extended over the statutory period." *Downie v. City of Renton,* 167 Wash 374, 382, 9 P2d 372, 375 (1932).  However, the use need not be daily or on any particular schedule.  Instead, "the claimant need only demonstrate use of the same character that a true owner might make of the property considering its nature and location." *Lee v. Lozier*, 88 Wash App 176, 185, 945 P2d 214, 219 (1997) (prescriptive easement for boat dock may be gained by seasonal use if such use would be normal for that dock), *quoting Double L. Properties, Inc. v. Crandall,* 51 Wash App 149, 158,

24 - FINDINGS AND RECOMMENDATIONS

751 P2d 1208 (1988) (citation omitted); *see also Howard v. Kunto,* 3 Wash App 393, 398, 477

P2d 210, 214 (1970) (continuous possession is established where the claimant uses the property

in the way that an owner of property of like nature and condition would hold, manage, and care

for the property).

      The record contains no concrete information to establish that Sirrah or any of its

predecessors used the road continuously and uninterrupted for the requisite 10 years.  On

February 15, 2005, Sirrah's attorney stated that the "old railroad bed has been used for years as a

railroad spur, then as a roadway for forest practices," that it "would not surprise anyone if the

road had been used 100 years ago," that road use was "apparent" when Sirrah purchased the land

in 1968, and that "there were the remains of an old saw mill on the Sirrah property."  AR 442.

He also asserted that Sirrah's "agents" continued to use the road for access to the property after

Sirrah's purchase in 1968.  *Id.*  The USFS noted that the information provided by Sirrah's

attorney was "not adequate" to establish a prescriptive easement "at this point, as it contains

assertions but includes no documentation to back them up."  AR 441.  Therefore, on March 10,

2005, the USFS requested detailed information from Sirrah, including "written signed

statements" detailing the history and use of the railroad and road by "current or former

landowners, adjoining landowners, current or former employees or contractors utilized by Sirrah

[], and other persons who can attest to use of the old railroad/road bed to access the Sirrah

holdings," as well as "specific" information regarding "when and for what purpose Sirrah [] used

the subject road to access properties under its ownership."  AR 467–68.  As of May 3, 2005, the

USFS had received no response from Sirrah and sent a second letter reiterating the "critical"

nature of the requested information "to determine what type of road use, if any, is issued to

Sirrah."  AR 469.

On May 25, 2005, the USFS received a response from Sirrah's attorney containing some

vague information regarding the historical use of the road.  AR 500–01.  The letter stated that

Sirrah had located Larry Whitmire who:

> moved onto the property near the Sirrah property in 1967 or 1969.  Mr.
> Whitmire says that a man named Clyde Milsap used to run cows on the
> Sirrah property and he would use the old railroad grade to access the
> Sirrah property from the public road.  It was overrun with blackberries for
> a while after that, but in 1979, Bill Lyons cleared the rail bed and used it
> as a road way for removing timber from the Sirrah property. . . . Mr.
> Whitmire says he knows a man named Marin Adams [who] felled timber
> on the Sirrah property and used the old rail bed to remove the logs.

AR 500.

Sirrah's letter was not accompanied by signed statements or affidavits.  On June 14,

2005, the USFS also received a letter from Eugene "Bud" Harris who confirmed that Bill Lyons

used the road to remove timber in 1979 from what is now Sirrah's land.  AR 522.  Mr. Harris

also alleged other road uses which occurred after 1991 when the USFS acquired the property.

*Id*.

The USFS also learned from the chain of title that the railroad bed had been in place

either as a logging railroad or road since 1910 to access the Sirrah property.  However, the lease

authorizing the construction of the logging railroad also required that the railroad iron and ties be

removed 15 years after termination of the March 10, 1908 lease, or by 1923.  AR 472, 485-86.

Even if one assumes that the railroad had been used continuously and uninterrupted for up to 13

years after its construction (1910 through 1923), it was certainly abandoned upon its removal.

26 - FINDINGS AND RECOMMENDATIONS

The record is devoid of facts concerning use of the remaining railroad bed until Sirrah's purchase in 1968.

Based on the historical record, it is certainly reasonable to infer that the subject road was intended to provide access to the property retained by Sirrah. However, the record does not contain evidence that it was actually used continuously and uninterrupted for the statutory period of 10 years. Sirrah provided no "specific" information, as requested by the USFS regarding use of the road by Clyde Milsap or Marin Adams. At best, Sirrah established only infrequent use of the subject road over an unspecified length of time. This is insufficient to establish a prescriptive easement. *See Granite Beach Holdings, LLC v. Dep't of Natural Res.,* 103 Wash App 186, 201-02, 11 P3d 847, 855-56 (2000) (citations omitted) (use of one road by an owner to look at timber only two or three times over 20 years and by a subsequent owner only three times during nine years, as well as use of another road occasionally to view property, held not to be a continuous use).

In addition, the USFS never established whether any use of the road was "with the knowledge of [the] owner at a time when he was able in law to assert and enforce his rights." *Drake,* 122 Wash App at 151, 89 P3d at 729. "Where the land is vacant, open, unenclosed, and unimproved, use is presumed permissive. In such a case, evidence is required indicating that the use was indeed adverse and not permissive." *Standing Rock Homeowners Ass'n v. Misich,* 106 Wash App 231, 239, 23 P3d 520, 525 (2001), *quoting Granite Beach Holdings, LLC,* 103 Wash App at 200, 11 P3d at 855. The record contains no correspondence between the USFS and Donald Becker, who sold the property to the USFS in 1991 (AR 472), nor any other previous owners to ascertain whether they were aware of any use of the subject road across their property

or gave permission to use it.  Thus, neither Sirrah nor the USFS established this element of a prescriptive easement.

In sum, the USFS initially determined that Sirrah's assertions were inadequate to support a prescriptive easement claim.  AR 441.  Sirrah's subsequent correspondence did little, if anything, to support Sirrah's claim. See AR 479, 500, 522.  Sirrah provided no information that it had used the road in a way that would support a prescriptive easement claim prior to 1991. Additionally, nothing in the record shows that the land Sirrah purchased in 1968 came with a valid prescriptive easement claim acquired by a previous owner.

### d.    Boundary Acquiescence

Alternatively, the USFS argues that Sirrah's pre-existing right to use the subject road segment is established by the doctrine of boundary recognition and acquiescence because the eastern edge of USFS Road #1852147 forms the property line between the Becker and Ursin parcels.  Under this theory, "if adjoining property owners occupy their respective holdings to a certain line for a long period of time, they are precluded from claiming that the line is not the true one." *Lamm v. McTighe*, 72 Wash 2d 587, 592, 434 P2d 565, 568 (1967).  In order for acquiescence to be operative, three elements must be present:  (1) the line between the properties must be "certain, well defined, and in some fashion physically designated upon the ground;" (2) "in the absence of an express agreement establishing the designated line as the boundary line, the adjoining landowners, or their predecessors in interest must have in good faith manifested . . . a mutual recognition and acceptance of the designated line as the true boundary line;" and (3) the "acquiescence in the line must have continued for that period of time required to secure property

by adverse possession." *Id* at 593.  The period of time required to establish adverse possession

in Washington is 10 years.  RCW 4.16.020.

With respect to whether the boundary is "well defined," the line allegedly demarcating

the boundary is the subject road.  The record reveals that the subject road is not drivable, has not

been used for hauling logs since 1979, and is overgrown with brush to the point that it could

barely be recognized in the 1988 aerial photos.  AR 502.  However, the subject road is physically

designated on the ground by the old railroad bed.  The President of Sirrah Corporation drove his

pickup on the road in 2002 and has used it for access several times since then with his forestry

consultant, noting evidence of use by others.  AR 522.  Neighbors have told him that they ride

horses on the road.  *Id*.  When an engineering report was prepared on the status of road access to

the Sirrah property in October 2004, the engineers had no trouble locating and walking the road.

AR 412-22.  The gravel and grading from when the road was a railroad bed are still present.

Thus, it is reasonable to conclude that the location of the subject road is "well-defined."

The second element requires a manifestation of mutual recognition and acceptance of the

subject road as the boundary line.  There are no statements from previous property owners about

where they thought the boundary line was located.  Instead the USFS relies on a description by

Donald Becker in his January 9, 1990 offer to sell his property to the USFS that the northwest

corner of the property was located about 1000 yards north "of where the road turns." AR 503.

As surmised by the USFS, he most likely was referring to the Old Ryan-Taveli Road which

crosses the Becker property south of the subject road.  He made no mention of the northwest

corner being located on the eastern side of a railroad bed, which would seem to be an important

feature to describe to potential purchasers.  From this omission, the USFS reasonably infers that

Mr. Becker, who owned the Becker parcel from 1968 to 1991, presumed that the subject road was wholly on the Ursin parcel. This inference, however, does not support the conclusion that the subject road is the boundary line. It only supports the conclusion that the subject road is wholly on the Ursin parcel, rather than on the Becker parcel. None of the maps or other evidence in the record show the subject road as the boundary line.

As to the third element requiring 10 years of acquiescence to the boundary line, the record is devoid of any supporting facts.

As a result, the doctrine of boundary acquiescence is not applicable.

### e.      Appurtenant Easement

The USFS also argues that Sirrah has an appurtenant easement. An appurtenant easement is defined as an easement that "is part of the realty it benefits" which "passes with the dominant estate unless the parties otherwise agree." *Olson v. Trippel*, 77 Wash App 545, 552, 893 P2d 634, 638-39 (1995). In Washington, "a very strong presumption exists in favor of construing easements as appurtenant." *Pioneer Sand & Gravel Co. v. Seattle Const. & Dry Dock Co.*, 102 Wash 608, 618, 175 P 508, 511 (1918).

The USFS claims that Sirrah's easement is appurtenant because the language of the reserved easement in the 1977 deed to Ursin indicates that it was intended to run with the land and was not dependent upon the owner of the subject property. AR 450. "An easement appurtenant passes to successors-in-interest by the conveyance of the property to which it is appurtenant regardless of whether it is specifically mentioned in the instrument of transfer." *Kirk*, 66 Wash App at 239, 831 P2d at 796. Although the easement was not reserved in the

USFS's deed when it acquired the Becker parcel in 1991, the USFS claims that the easement was still present as an easement appurtenant.

Sirrah's easement may be appurtenant to the Ursin parcel, but this court fails to understand how it can be appurtenant to the Becker parcel over which it was never expressly reserved. Sirrah never owned the Becker parcel, and there is no evidence that the owners of the Becker parcel orally or in any other way granted Sirrah an easement. Instead, the historical record supports only the theory that the subject road was mistakenly believed to be located solely on the Ursin parcel.

### f.    Conclusion

Based on the record, this court can find no viable legal theory to support the USFS's conclusion that Sirrah had a right to an easement over the subject road which pre-existed its acquisition of the Becker parcel in 1991. This court is sympathetic to the USFS since in 1991, had it known of the mistake in constructing the underlying railroad bed, the USFS would (and should) have granted Sirrah an easement over the Becker parcel to complete Sirrah's access to its property over the subject road. The disputed portion of the subject road is only a short distance and requires only minor reconstruction to be operational. However, the fact remains that the mistake in construction of the railroad in 1910 does not automatically convert into an access easement in 2005 for Sirrah over the Becker parcel due to the unintended encroachment. Unfortunately, the current record fails to reveal that Sirrah has a viable claim to establish a legal right to that easement. As a result, the USFS's discretionary decision to grant that easement for ingress and egress to Sirrah required compliance with NEPA.

The USFS determined that the temporary use permit qualified for a CE under NEPA, based on Categories 4 and 8. Category 8 for "minor, short-term(one year or less) special uses" clearly does not apply to the granting of a permanent access easement. Whether Category 4 applies for "repair and maintenance of roads" is uncertain given that the proposed use is road reconstruction, as discussed below. If no CE applies, then the USFS must prepare an EA in connection with the issuance of the quitclaim deed granting an easement to Sirrah. This court would rather not divert the finite personnel and resources of the USFS away from more productive enterprises, but is required to apply the law and not engage in "rough justice."

## B.    Consistency Determination

In addition, Friends argues that the USFS's Consistency Determination under the Scenic Area Act constitutes a "federal action" that must be reviewed under NEPA. Under NEPA's implementing regulations, "federal actions" include "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision." 40 CFR § 1508.18(b)(4).

As support for its argument, Friends points to a provision of the Scenic Area Act, 16 USC § 544o(f)(1), which exempts certain actions from NEPA analysis. The list of exceptions to NEPA does not include federal consistency determinations. However, the NEPA exemption list is not exclusive, and the Scenic Area Act does not explicitly provide that NEPA applies to consistency determinations. Instead, it states that: "Except as provided in paragraph (1) of this subsection, nothing in sections 544 to 544p of this title shall expand, restrict, or otherwise alter the duties of the Secretary under [NEPA]." 16 USC § 544o(f)(2). In other words, the USFS's NEPA obligations are unchanged by the Scenic Area Act. This court rejects the argument that

simply because the USFS performed a Consistency Determination, it also must perform a NEPA

analysis.  The two acts require separate and independent determinations.

## II.    <u>Violation of Scenic Area Act</u>

The Scenic Area Act allows a private suit by a citizen to seek judicial review to remedy

violations of the act.  16 USC § 544m(b)(2) & (4).[5]  Friends alleges that the USFS violated the

Scenic Area Act by:  (1) failing to review the permanent easement granted to Sirrah, and the

associated road reconstruction and use, for consistency with the RMP; and (2) erroneously

concluding that the road work and the use of the road were not discontinued uses under the RMP

and, therefore, failed to review the project under all the appropriate resource protection

guidelines.  The USFS responds that these arguments fail because Friends misconstrues the

USFS's responsibilities under the RMP.

### A.    <u>Applicability of the RMP</u>

The USFS conducted a Consistency Determination for the temporary road use permit

under the 1991 Management Plan.  When the USFS issued the quitclaim deed to Sirrah in 2005,

it withdrew the temporary use permit, but retained that Consistency Determination because it

governed the road on both the Becker and Ursin parcels.  Friends argues that the USFS could not

maintain the Consistency Determination for a change from a temporary to a permanent easement

when it issued the quitclaim deed to Sirrah, but had to conduct a new Consistency Determination

under the RMP.

---

[5] The statute provides for the filing of a civil action "against the Secretary, the Commission or any county."  16 USC § 544m(2).  Friends is suing the USFS, rather than the Secretary of Agriculture, but the USFS does not contend that it has been improperly named.

Sirrah filed its application on May 28, 2004, and the Consistency Determination is dated July 20, 2004.  Because the Secretary of Agriculture did not concur with the RMP until August 10, 2004, the guidelines contained in the 1991 Management Plan applied to the July 20, 2004 Consistency Determination.  However, the USFS revisited the Consistency Determination on December 6, 2005, and, without further explanation, acknowledged that it was still in effect. AR 527.  Because the RMP guidelines had been in effect for more than a year, the USFS's December 6, 2005 Consistency Determination must be evaluated in accordance with the RMP guidelines.  Yet the USFS has never determined whether the easement which granted Sirrah permanent use of the road for ingress and egress is consistent with the RMP.

The USFS counters that the outcome would have been the same because the pertinent provisions of the Management Plan are substantially similar to those in the RMP, particularly with respect to the parties' dispute concerning discontinued uses.  Friends does not indicate how the RMP materially differs from the Management Plan or how those differences would affect the result.  In fact, it admits that the discontinued use provisions of the Management Plan are substantially similar to those in the RMP.  Instead, it argues that the Consistency Determination is insufficient even under the Management Plan.

## C.     **Insufficiency of Consistency Determination**

Friends first argues that the Consistency Determination violated the Management Plan, and thus the Scenic Area Act, by erroneously considering the subject road to be an "existing" road and failing to consider whether the proposed use (reconstruction and log hauling) was consistent with all resource protection guidelines that apply to new uses.

The RMP addresses three types of uses: existing uses, new uses, and discontinued uses (*i.e.* uses that have been discontinued for one year or more).  AR 264-69.  The reestablishment of a discontinued use must be reviewed as if it were a new use because it "shall not be considered an existing use."  AR 269.  On the other hand, if existing uses do not change, then they do not generally need to be reviewed.  AR 264, 269.  The RMP provides that "[m]aintenance, repair, and operation of existing . . . roads" are uses allowed outright without the need of a Consistency Determination.  AR 200.  Repair and maintenance require that the road already be serviceable, which is not the case here.  In contrast, "[r]oad and structure construction and/or reconstruction design" and "[r]ailroad and road construction or reconstruction" are "forest practices," which are not uses allowed outright and which must be reviewed for consistency with the applicable SMA guidelines.  *Id*.  "Reestablishment of a discontinued use or structure [structure includes roads, *see* AR 362] that has been discontinued [for one year or more] shall be subject to all applicable guidelines in the Management Plan, including, but not limited to, guidelines for land use designations and scenic, cultural, recreation and natural resources."  AR 269.

In 2003, the USFS noted that natural closure of the road was "complete" and assigned it a Level 1 classification, which was meant for roads that had been closed for more than one year.  Suppl. AR 73.  In July 2004, the USFS noted that the road had not been maintained and was not accessible to logging trucks.  AR 394, 396.  The Findings of Fact in the Consistency Determination noted that given the condition of the roadbed and the amount of work necessary to reestablish the road, "the maintenance required may be considered reconstruction."  AR 397.  Because the road had not been used in at least one year for log hauling, the use of the road for logging purposes is a "discontinued use."

Contrary to Friends' characterization, the USFS did not apply certain findings because the project qualified as maintenance of an "existing" road.  Two Findings of Fact do refer to an "existing" road in connection with the natural resources guidelines.  Those findings state that "[n]o new wildlife disturbance will be created as the haul route is an existing road" and that "[n]o buffers are required for existing roads."  AR 400.  Although the road clearly exists as an unmaintained road, the USFS did not conduct a review as if the proposed use of the road was an "existing use."  Instead, as the USFS acknowledges, the project would involve road reconstruction (clearing bushes and cutting trees), rather than road maintenance, and road reconstruction is clearly subject to review.  Under the Forest Land Use designation, road construction and reconstruction are allowed uses which are reviewed under all applicable guidelines.  The USFS did review the proposed use for reconstruction and log hauling under all of those applicable guidelines.  Although Friends argues that the USFS did not apply all of the guidelines that must be applied to re-establishing a discontinued use, they have not pointed to any specific guideline that was not applied that would change the result of the review.

Friends does take issue with some of the Findings of Fact which are attached to the Consistency Determination to document the review of the Management Plan guidelines under the Forest Land Use designation for forest practices and the applicable guidelines for review of the scenic, cultural, natural, and recreational resources guidelines.  AR  396-401.  In particular, Friends contests the findings that many of the approximately 30 guidelines do "not apply to road maintenance."[6]  The USFS found those guidelines to be inapplicable because they refer to the

_____

[6] Under the RMP, approximately 34 guidelines would not have applied to road maintenance activities.  AR 204-10 (RMP II 42-48, Part II: Forest Land Use Designation, Chapter 2: Forest Land, SMA Provisions, Review Uses, Forest Practice).

harvest unit itself, rather to road reconstruction or maintenance:  reforestation plan; planting

native species; percentage of created openings at one time; harvest opening size, shape and

dispersal; harvest opening maximum size; clearcutting on federal land; harvest units breaking the

skyline; harvest units spaced at 400 feet apart; six live trees left per acre; snags and wildlife

trees; down logs; old growth forests; species composition; mix in age of hardwoods;

revegetation; soil productivity.  Since these guidelines under the Management Plan relate to

forest practices, they simply are not applicable to the proposed use of the subject road for

reconstruction and hauling logs.

Second, Friends finds noteworthy that many guidelines were found inapplicable "to road

maintenance" rather than "to road reconstruction."  "Road maintenance," unlike "road

construction" or "road reconstruction," is not a forest practice requiring review under the

Management Plan.  However, it is clear that the reviewer used the term "road maintenance" to

differentiate the road related activities from the harvest activities.  As conceded by the reviewer,

"[d]ue to the condition of the roadbed, the maintenance required may be considered

reconstruction."  AR 397.  The same guidelines would have been inapplicable had the reviewer

instead used the term "road reconstruction."  The USFS reviewed the proposed road use in

accordance with all applicable Management Plan guidelines, regardless of its use of the term

"road maintenance."

Friends further argues that the USFS did not properly apply the guidelines for protection

of water resources or of wildlife and plant resources.  It points out a need for buffers around

water resources because the road crosses a stream, which is necessarily bordered by riparian

areas, and potentially by wetlands.  *See* AR 368 ("The road intersects a live stream on National

Forest land near its northerly end which passes through an 18" culvert pipe."). It also notes a previous USFS roads report recognizing a critical concern for aquatic and wildlife resources with respect to this road. *See* Suppl. AR 86.

The Findings of Fact addressed both of these issues. With respect to buffers, it stated:

> No areas requiring buffers are in the vicinity. No buffers are required for existing roads. The road drainage should be controlled to prevent erosion. A condition should be placed requiring upon completion of the log haul, 2-3 drivable cross ditches to divert surface water off of the road during heavy rainfall or snow melt be installed. It should also be required that the applicant perform any maintenance on the 18" culvert at milepost 0.47 that is necessary to keep it open and functioning.

AR 400.[7]

The reference to the 18" culvert is clearly the same 18" culvert as the one carrying a live stream under the subject road. Thus, the reviewer was aware of the subject road crossing a stream. Furthermore, the road does exist in the sense that it was built on the old railroad grade and is still visible, but too overgrown to be driveable. At least based on the current record, this court cannot conclude that the USFS failed to identify potential adverse effects of the proposed road use on riparian areas.

The Findings of Fact also found that "no sensitive wildlife or plant species would be impacted" and that "[n]o new wildlife disturbance will be created as the haul route is an existing road." AR 400. Friends has not submitted sufficient evidence for this court to conclude that this finding is erroneous.

With respect to the cultural resources guideline, the USFS found that "neither a Cultural Resource Reconnaissance Survey nor a Historic Survey are required" and recommended as a

---

[7] Harkenrider adopted that condition. AR 395.

condition of approval that the applicant cease all work and notify the authorities "should any

historic or prehistoric cultural resources be uncovered during harvest activities."  AR 400.

Friends contests this finding.  The USFS responds that Friends has waived this issue by failing to

raise it in the administrative appeal.  However, Friends discussed this issue in its initial comment

letter (AR 392) and was not required to file an administrative appeal.  *See Darby v. Cisneros*,

509 US 137, 153-54 (1993) (unless an administrative appeal is required by Congress or obtains

an absolute right for an automatic stay or injunction while the process runs its course, there is no

administrative appeal requirement).

Even if Friends did not waive this issue, the USFS responds that it was not required to

conduct the Cultural Resource Reconnaissance Survey because reconstruction of the road was

specifically excepted as "reconstruction of existing [road]. . . under the Management Plan" and

hauling timber was excepted as involving "minor ground disturbance."  Management Plan I-51.

The USFS also responds that it was not required to complete a Historic Survey because the road

was located more than 500 feet from the nearest known cultural resource and the project did not

involve a standing structure.  Management Plan I-53.  Friends has not submitted any evidence to

contest these conclusions by the USFS.

However, when the USFS issued the quitclaim deed, which granted a permanent access

easement to Sirrah, the project changed dramatically from a one-time, temporary use for log

hauling (as described in the application for a temporary permit) to a permanent use that may

often be repeated, ostensibly without further review.  The USFS responds that it did not have to

conduct a new Consistency Determination because the use subject to review did not change.

However, the use (road reconstruction and log hauling) did change since it is no longer limited

only to road reconstruction for one season of log hauling.  Instead, it is now an unconditional easement for ingress and egress.  Conceivably, Sirrah's easement could be used not only to periodically log the Sirrah property, but also to develop the Sirrah property, potentially resulting in a different use of the road.  Even if the use subject to review did not change, the frequency of the use certainly did change from a one-time, temporary use to a recurring, permanent one.

Certain guidelines apply to account for potential "cumulative effects" when evaluating adverse impacts to sensitive wildlife, plans, and other natural resources.  *See* AR 135, 141; *see also* AR 348 ("cumulative effects" are the "combined effects of two or more activities. . . . Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time").  Because repeated ingress and egress might have different impacts when done temporarily for log hauling versus repeatedly for log hauling or potentially for other purposes, the USFS should consider the long-term effect of actions involving the subject road over a period of time.

As a result, this court finds that, in violation of the Scenic Area Act, the December 2005 Consistency Determination was insufficient with respect to the cumulative effects of the recurring, permanent and unconditional access easement granted to Sirrah and should be conducted pursuant to the RMP.

### D.    **Enforcement**

The USFS also contends that it has no jurisdiction to enforce the Management Act guidelines on the subject road, either over the Ursin or Becker parcels.  It explains that it reviewed the proposed road use and submitted a Consistency Determination covering both parcels on July 20, 2004, only because Sirrah submitted a Forest Practice Application for logging

on private land to the Washington Department of Natural Resources ("DNR").  Pursuant to its

agreement with the DNR, the USFS explains although the DNR is responsible for the SMA

private lands, the USFS reviews DNR Forest Practice Applications that encompass activity

within the SMA and submits its recommendations to the DNR which, according to its

regulations, "shall review and consider the [USFS] review statement and shall consult with the

[USFS] and the Columbia River Gorge Commission prior to making any determination an on

application or notification within the CRGNSA special management area."  Wash Admin Code

222-20-040(6)(c) (2007).  As a result, the USFS states that only the DNR has the authority to

enforce the terms of its approval of  Sirrah's Forest Practices Application.

      The USFS's position presents several problems.  First, both the Scenic Area Act and the

RMP give the USFS an independent duty to review certain uses over federal land.  The RMP

dictates that "in some cases, such as review of forest practices, the [USFS] will retain

jurisdiction to review uses of development and certify consistency with the [RMP].  Where this

is the case, the [USFS] will monitor the results of these actions to ensure that required mitigation

measures are implemented and resources are protected."  AR 336-37.  The Scenic Area Act

requires the USFS to "administer Federal lands within the [SMAs] in accordance with [the

Scenic Area Act] and other laws, rules and regulations applicable to the national forest system."

16 USC § 544(a)(1); *see also* AR 341.  The quitclaim deed may have granted Sirrah an access

easement, but the USFS still owns the underlying land (on both the Ursin and Becker parcels)

which it is obligated to administer in accordance with the Scenic Area Act.

Second, the USFS has submitted no evidence as to the terms of its agreement with the DNR, and has not explained how or even why it would contract its responsibilities and enforcement powers to a state.

Third, the subject road was never part of the forest practice application Sirrah submitted to the DNR. *See* Friends' Motion for Summary Judgment, Exhibit B, p. 6 ("A road use permit to use [the subject road] has/will be obtained"). The record contains no documentation of communications between the DNR and the USFS, and the DNR permits list no conditions of approval, let alone conditions pertaining to the Scenic Area Act. *Id,* Exhibit B, p. 27, & Exhibit C, p. 15. The USFS relies on a 1995 statement by a USFS employee that the agency had no "enforcement hammer." AR 43. The statement was made before formal USFS policies on consistency determinations were adopted in 1996. Suppl. AR 125-28. These policies show that each Consistency Review must result in a Consistency Determination which may include enforceable conditions of approval to ensure consistency. Suppl. AR 125-26.

In light of the record as a whole, the court cannot accept the USFS's "*post hoc* rationalizations for agency action." *Northwest Envtl. Defense Ctr. v. Bonneville Power Admin.*, 477 F3d 668, 688 (9th Cir 2006) (citation omitted). Therefore, this court finds that even after the issuance of the quitclaim deed, the USFS retains jurisdiction over the subject road under the Scenic Area Act.

**RECOMMENDATIONS**

For the reasons set forth above, plaintiff's Motion for Summary Judgment (docket # 44) should be GRANTED and the USFS's Cross-Motion for Summary Judgment (docket # 56) should be DENIED. Accordingly, this court should declare that the USFS violated NEPA and

42 - FINDINGS AND RECOMMENDATIONS

the Scenic Area Act and enjoin any implementation of the road reconstruction and use until the

USFS complies with the law.

## <u>SCHEDULING ORDER</u>

Objections to these Findings and Recommendations, if any, are due **October 9, 2007.** If

no objections are filed, then the Findings and Recommendations will be referred to a district

judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendations will be referred to a district judge and go under advisement.

DATED this 21st day of September, 2007.


/s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge